*This opinion is subject to revision before final publication in the Pacific Reporter*

**2026 UT 23**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

In the Matter of the Adoptions of B.C., K.J.C., D.W.C., and B.C., persons under eighteen years of age

C.C.,
*Appellant,*

*v.*

A.K. and L.K.,
*Appellees.*

No. 20230726
Heard January 30, 2026
Filed July 30, 2026*

On Certification from the Court of Appeals

Second District Court, Weber County
The Honorable Noel S. Hyde
No. 202900022

Attorneys:

Emily Adams, Sara Pfrommer, Melissa Jo Townsend, Bountiful, for appellant

Charles R. Ahlstrom, Farmington, for appellees

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which JUSTICE PETERSEN, JUSTICE NIELSEN, and JUDGE LUTHY joined.

---

* As of January 31, 2026, "The Supreme Court consists of seven justices." UTAH CODE § 78A-3-101(1). Pursuant to Utah Supreme Court Standing Order No. 18, this court sat and rendered judgment in this matter as a division of five justices.

ASSOCIATE CHIEF JUSTICE POHLMAN authored an opinion concurring in part, dissenting in part, and concurring in judgment.

JUSTICE HAGEN stepped down from the court before this case was decided. COURT OF APPEALS JUDGE JOHN D. LUTHY, having reviewed the briefs and listened to a recording of the oral argument, substituted for JUSTICE HAGEN and participated fully in this decision.

JUSTICE JORGENSEN and JUSTICE DENT became members of the Court after oral argument in this matter and did not participate.

———————————

CHIEF JUSTICE DURRANT, opinion of the Court:

## INTRODUCTION

¶1    This case concerns the termination of Father's parental rights to his four children—B.C., K.J.C., D.W.C., and B.C.—in order to facilitate Stepfather's adoption of them. The district court concluded that termination was strictly necessary to promote the children's best interest. Father appealed, arguing that while the court applied the correct strictly necessary analysis, its findings were against the clear weight of the evidence.

¶2    Following our decision in *Ross v. Kracht*, 2026 UT_, _ P.3d _., where we held that the termination of parental rights under Utah Code subsection 81-13-205(5)(e) of the Utah Adoption Act requires a strictly necessary analysis, we hold that the district court applied the correct analysis. And we do not agree with Father that the court's best interest determination was against the clear weight of the evidence. We therefore affirm the termination of Father's parental rights.

## BACKGROUND

¶3    In 2004, Father and Mother married. They lived in Utah until 2011 when they moved to Alaska for Father to start a new job. Between 2007 and 2014, Father and Mother had four children, B.C., K.J.C., D.W.C., and B.C. And up until 2013, Father was reportedly a good father and actively involved in the three eldest children's upbringing.[1]

———————————

[1] The youngest child, B.C., was not born until 2014.

¶4    But in July 2013, Father was arrested and pled guilty to two counts of sexual abuse of a minor. The victim was a fifteen-year-old girl who was staying with Mother and Father temporarily. Father was sentenced to prison in Alaska and was not released from custody until March 2023. Father is required to register as a sex offender for life.

¶5    For the first few months following Father's arrest, Mother took the three eldest children for in-person visits with Father while he was incarcerated. But in October 2013, to better support the children and be closer to family, Mother moved back to Utah with the children. For roughly the next year and a half to two years, Father continued to have phone visitation with Mother and the children. But, after participating in domestic violence classes—which made her rethink her relationship with Father—and struggling to afford Father's incoming prison calls from Alaska, Mother requested that Father communicate with the children through letters instead of phone calls.

¶6    Since the phone calls stopped, Father's communications with the children have been few and far between. In 2015, Father sent each of the children a card for their birthday—not including B.C., the youngest. In 2017, Father reportedly crocheted hats that he sent to his stepmother to give to the children. Later, around Christmas in 2020, Father called the children while they were at his sister's house. When asked about this call at the termination trial, Father testified that he "wanted them to know that [he] . . . still loved them and wanted to be part of their lives and that [he] didn't abandon them." In 2021, Father, as part of his sex offender therapy, attempted to make another call. But because Mother did not want herself or the children to participate, the call did not happen. And finally, in 2022, Father called the children again while they were with his sister. Only the two youngest spoke with him. Mother was not notified of the call beforehand and was upset once she was informed of it by Father's sister. Since the 2022 phone call, Father has had no further contact with the children.

¶7    While Father has not had contact with the children during this time, his sister and stepmother have maintained relationships with them. Since 2013, Father's sister has had the children for overnight visits and activities like roller-skating and movie nights. Father's stepmother, while being less involved, has also had a presence in the children's lives and has been invited to the children's events.

¶8   During Father's incarceration, Mother filed for a divorce, which was finalized in 2016. That same year, Mother married Stepfather. Since Stepfather and Mother started dating in 2015, Stepfather has been involved in the children's lives, and the children view him as a father figure. In April 2020, Mother and Stepfather filed an adoption petition so that the children could be adopted by Stepfather. Because they did not ask the court to terminate Father's parental rights in that petition, they filed an amended petition that included the request.

¶9   In May 2023, the district court held a two-day evidentiary hearing on the termination of Father's parental rights. The court heard testimony from Mother, Stepfather, Father, and Father's parole officer, stepmother, and sister.

¶10 A significant focus of Mother's and Stepfather's testimonies concerned the fact that three of the children have special needs that require extra parental provision of structure, attention, and routine. Mother testified that the oldest, B.C., has learning disabilities that require her to receive extra services in school. Behaviorally, Mother testified that when nervous, B.C. will pick at her skin, causing sores and lesions. B.C. receives services through the Division of Services for Disabilities, and Mother and Stepfather described their day-to-day care of B.C. as intensive.

¶11 Mother testified that the two youngest children, D.W.C. and B.C., have autism and attention deficit hyperactivity disorder (ADHD). According to Mother, D.W.C. required extensive behavioral interventions to allow him to develop social skills and learn how to behave in different environments. Through a "very rigid, structured, therapy approach," D.W.C. has progressed to the point that he no longer needs active therapy and is being less disruptive in school. Before these breakthroughs, D.W.C.'s "impulsivity," which Mother attributed to his ADHD, made him difficult to discipline and caused him to get into fights at school. Stepfather testified that he initially "bumped heads" with D.W.C. but that D.W.C. has since "changed so much, and for the better." As to B.C., Mother testified that he is much more social than D.W.C. but still struggles with impulsivity. And he, like D.W.C., requires behavioral intervention.

¶12 When asked about her concerns about reintegrating Father into the children's lives, Mother worried about the susceptibility of the boys to changes in their environment. She said, "I feel like we would lose a lot of our ground behavior . . . with [D.W.C.] and

[B.C.]." She continued, "And I feel like it would be a very disruptive thing to them because rules would be different in a different home. And the fact that they have had [ten] years of experience of consistency and structure, I worry that the sudden disruption would cause a big tailspin." Mother testified that after visits with Father's sister, the children, who had been calling Stepfather "Dad," would revert to calling him by his first name. And D.W.C. would return "agitated" and struggle to follow household rules.

¶13 Notwithstanding her concerns about Father's reintegration, Mother has continued to allow visits with Father's sister. Mother testified that it was important for the children to "know about their biological side" and that she "wanted to keep contact with [Father's] side of the family."

¶14 In closing arguments, both sides assumed that the strictly necessary analysis applied to the termination of parental rights under Utah Code subsection 81-13-205(5)(e), which would require the court to explore whether other feasible options short of termination could equally promote the children's best interest.[2] As a part of Father's closing, Father's counsel asked the court to consider two alternatives to termination as a part of its strictly necessary analysis: (1) continuing the status quo with the possibility of reunification therapy; or (2) ordering a permanent custody and guardianship.[3]

¶15 Ultimately, the district court issued an oral ruling, later incorporated into a written order, terminating Father's parental rights. The court held that Mother and Stepfather had established, through clear and convincing evidence, that four grounds for the termination of Father's parental rights existed: abandonment, neglect, unfitness to parent, and token efforts.

¶16 The district court also held that termination of Father's parental rights was strictly necessary to promote the children's best interest. Central to its best interest determination, the district court

---

[2] *See In re D.S.*, 2025 UT 11, ¶ 39, 568 P.3d 1060.

[3] Under such an order, Father would maintain "[r]esidual parental rights," including "the responsibility for support," "the right to consent to adoption," "the right to determine the [children's] religious affiliation," and "the right to reasonable parent-time." *See* UTAH CODE § 80-1-102(72)(a).

found that the children, especially the three with special needs, had a "significant susceptibility to an unstable or unprotected or unpredictable environment" and therefore were "in desperate need of stability [and] of permanence." Given this need, the court concluded that "not only the maintenance but the enhancement of the current relationship," i.e., adoption, "[was] strictly necessary . . . to preserve the best interest of [the children]."

¶17 The court also rejected the alternatives to termination—continuing the status quo or creating a permanent custody and guardianship arrangement—because "the termination of guardianship without the termination of [Father's] parental rights could give rise to future litigation" should something happen to Mother. The court found this alternative to be "not only disruptive but also potentially destructive of the stability and welfare of the children."

¶18 Father appealed. And the court of appeals certified this case to us to determine whether the termination of parental rights under the Utah Adoption Act is subject to the requirement that termination of parental rights be strictly necessary to promote the best interest of the children. After determining that the termination order here was immediately appealable, in *In re Adoption of B.C.*, 2025 UT 23, 589 P.3d 686, we now consider Father's challenge to the termination order.

## ISSUE AND STANDARD OF REVIEW

¶19 In this appeal, the parties argue about whether termination under the Utah Adoption Act is subject to the strictly necessary analysis.[4] For the reasons we articulated in *Ross v. Kracht*, 2026 UT _, _ P.3d _, we conclude that it is. We therefore consider here only Father's challenge to the termination order. And because Father is not challenging the district court's determination that there are grounds for termination, the only issue before us is whether the court erred in its determination that the termination of Father's parental rights was strictly necessary to promote the children's best interest.

¶20 We may overturn a "best interest determination only when it is against the clear weight of the evidence" or leaves us "with a firm and definite conviction that a mistake has been

---

[4] This is despite both parties assuming that the strictly necessary analysis applied at closing arguments during the termination trial.

6

made."[5] "In other words, the [district] court must have either failed to consider all of the facts or, despite considering all relevant facts, reached a conclusion against the clear weight of the evidence."[6]

## ANALYSIS

¶21   Before a district court can terminate a parent's rights under subsection 81-13-205(5)(e) of the Utah Adoption Act,[7] it must make two determinations: (1) that there are one or more statutory grounds for termination; and (2) that termination is strictly necessary to promote the child's best interest.[8] Father challenges only the district court's second determination.

¶22   In performing a best interest analysis, the district court "must weigh the totality of the circumstances from the child's point of view."[9] This holistic inquiry encompasses "the physical, intellectual, social, moral, and educational training and general welfare and happiness of the child."[10] Further, termination must be "strictly necessary to promote the child's best interest."[11] This requires the district court to "explore whether other feasible options exist that could address the specific problems or issues facing the family," short of the drastic measure of terminating

---

[5] *In re D.S.*, 2025 UT 11, ¶ 46, 568 P.3d 1060 (cleaned up).

[6] *Id.* (cleaned up).

[7] While the 2013 version of the Utah Code applies and the legislature has renumbered and made subsequent changes to the Adoption Act, no substantive changes are applicable here, nor do any of the non-substantive changes impact our analysis. Thus, we cite the current version of the code in this opinion for convenience and clarity.

[8] *See* UTAH CODE § 81-13-205(5)(e); *Ross v. Kracht*, 2026 UT_, ¶ 28, _ P.3d _.

[9] *In re D.S.*, 2025 UT 11, ¶ 38, 568 P.3d 1060 (cleaned up); *see* UTAH CODE § 80-4-104(12)(b).

[10] *In re J.J.W.*, 2022 UT App 116, ¶ 26, 520 P.3d 38 (cleaned up).

[11] UTAH CODE § 80-4-301(1). While the 2013 version of the Utah Code applies and the legislature has made subsequent changes to section 80-4-301, no substantive changes are applicable here, nor do any of the non-substantive changes impact our analysis. We therefore cite the current version of the section in this opinion for convenience and clarity.

parental rights.[12] If other feasible alternatives can "equally promote the child's best interest, then termination is not strictly necessary."[13]

¶23 At the outset, we emphasize that our review here is deferential to the district court—and for good reason. As we observed in *In re D.S.*, "A [district] court has had the opportunity to observe the testimony and assess the respective credibility of the witnesses" and generally has had the time to "gain additional insight into the potentially complex family dynamics at play."[14] Accordingly, it is only when the district court's best interest determination "either failed to consider all of the facts or, despite considering all relevant facts, reached a conclusion against the clear weight of the evidence" that we will reverse.[15]

¶24 Here, Father argues that the district court's best interest analysis was incorrect for three primary reasons: (1) the court's best interest findings were based on categorical and speculative concerns when considering feasible alternatives to termination; (2) there was no evidence that Father's presence would disrupt or harm the children or their relationship with Stepfather; and (3) the court failed to consider the children's relationship with Father's family members.

¶25 We disagree and address each of Father's arguments in turn. Because we conclude these arguments fall short, we ultimately hold that the district court's best interest determination was not against the clear weight of the evidence.

¶26 Father first contends that the district court improperly relied on categorical and speculative concerns in making its factual findings in support of its best interest determination. Specifically, he takes issue with the court's concerns about the children's susceptibility to instability and potential future litigation should Father's parental rights not be terminated. He argues that these two concerns, which form the basis of the district court's best interest analysis, rest on categorical concerns about reintroducing a long-separated parent and the instability of a permanent guardianship.

---

[12] *In re B.T.B.*, 2020 UT 60, ¶ 67, 472 P.3d 827 (cleaned up).

[13] *In re D.S.*, 2025 UT 11, ¶ 39 (cleaned up).

[14] *See id.* ¶ 58.

[15] *Id.* ¶ 46 (cleaned up).

And he argues that the concerns rely on speculation that Father's presence would be destabilizing to the children.

¶27  In *In re J.A.L.*, we reversed a termination order that relied on the categorical concern that a permanent guardianship "would not provide the same degree of permanency."[16] We reasoned that the court's responsibility in assessing feasible alternatives to termination, as a part of the strictly necessary analysis, "is not met by the categorical concern that a permanent guardianship is not as stable or permanent as an adoption."[17] If such a categorical concern were enough, "termination and adoption would be strictly necessary across the board."[18] Consequently, the best interest inquiry "requires analysis of the particularized circumstances of the case before the court."[19]

¶28 In *In re A.H.*,[20] we further clarified the proper consideration that courts should give to the categorical differences between adoption and permanent guardianship. There, we recognized that "*In re J.A.L.* did not prohibit courts from taking the differences between permanent guardianship and adoption into account when making the termination decision."[21] While the categorical differences "cannot be dispositive in and of themselves," "they can be one of the many factors evaluated in the particularized best interest analysis."[22] In sum, courts are free to consider the categorical differences between termination and other feasible options "so long as the reasoning is case specific."[23]

¶29  For example, in *In re D.S.*, we upheld a juvenile court's termination order that was grounded in concerns for the children's stability.[24] Although the juvenile court relied on its determination that adoption would provide greater stability than other options,

---

[16] 2022 UT 12, ¶¶ 24–25, 506 P.3d 606 (cleaned up).

[17] *Id.* ¶ 25.

[18] *Id.* ¶ 24.

[19] *Id.* ¶ 25.

[20] 2024 UT 26, ¶¶ 66–70, 554 P.3d 969.

[21] *Id.* ¶ 69.

[22] *Id.*

[23] *In re D.S.*, 2025 UT 11, ¶ 50.

[24] *Id.* ¶¶ 49–51.

we concluded that it "ultimately based its determination on the specific needs of [the] children."[25] The juvenile court found that the children endured instability with their parents but had gained stability with their grandmother. The court ultimately concluded that "further disruption would be detrimental" to the children's interest in stability.[26] We held that "the juvenile court's recognition of the children's particular need for the stability that adoption by [the grandmother] would provide was a valid, individualized ground for the court's best interest determination."[27]

¶30 Here, like in *In re D.S.*, while some of the district court's reasoning appeared to rest on the categorical consideration that adoption would provide the children with more stability than continuing the status quo or ordering a permanent guardianship, it properly tied that consideration to the "particularized" needs of the children.[28] In its order, the court made detailed findings related to the special needs of three of the children—i.e., the eldest, B.C., with her learning disabilities, and the boys, D.W.C. and B.C., with their autism and ADHD diagnoses. Given the children's developmental concerns and day-to-day needs, the court found that the children had a "significant susceptibility to an unstable or unprotected or unpredictable environment" and were "in desperate need of stability [and] of permanence." And given the particular susceptibility of the children to instability, the court concluded that the enhancement of the children's current circumstance—adoption by Stepfather—was strictly necessary to promote the best interest of the children. So, although the court factored in adoption's greater permanence, it grounded its analysis on the particularized need for these children to have stability.

¶31 The district court relied on similar reasoning in rejecting the alternatives before it—either maintaining the status quo or creating a permanent guardianship. The court reasoned that without terminating Father's rights, there would be a possibility of

---

[25] *Id.* ¶ 50.

[26] *Id.* (cleaned up).

[27] *Id.* ¶ 51.

[28] *See In re A.H.*, 2024 UT 26, ¶ 70 (upholding juvenile court's termination order where its ruling "suggests that it properly engaged with the particularized reasons why termination and adoption was a better option . . . than permanent guardianship").

future litigation, should something happen to Mother. And it found that possibility to be "not only disruptive but also potentially destructive of the stability and welfare of the children." Again, while the court relied on some categorical differences between adoption and the alternatives, it properly grounded its analysis on the children's "particular need for the stability that adoption by [Stepfather] would provide."[29]

¶32 Next, while Father recognizes that the court's concern about stability could be legitimate, he argues that there was no evidence that his reintegration with the children would disrupt or harm them or their relationship with Stepfather. Specifically, he contends that there was no evidence that continuing the status quo—with the children living with Mother and Stepfather and Father having some relationship with them—would result in harm to the children. He further argues that in conjunction with continuing the status quo, he would be willing to participate in reunification therapy so as to limit the disruption his presence could have on the children's lives.

¶33 But Father's argument here misses the mark in several ways. First, Father overlooks the fact that at the time of the termination trial, he had not seen any of the children since 2013, had never met the youngest child, and had neither spoken nor interacted with the children but for a handful of times since Mother discontinued phone visitation around 2015. Under these circumstances, given the district court's individualized concern for the children's stability, it was proper for the court to forecast likely disruption from Father's reentry when the status quo was largely his absence.[30] Mother testified to this concern when she noted that the children "have had [ten] years of experience of consistency and structure" without Father, and that she "worr[ies] the sudden disruption would cause a big tailspin." Thus, with Father's absence from the children's lives and the children's susceptibility to

---

[29] *See In re D.S.*, 2025 UT 11, ¶ 51.

[30] *See In re A.H.*, 2024 UT 26, ¶ 56 (noting that a best interest analysis must include an assessment of the "likely future"); *In re C.L.*, 2007 UT 51, ¶ 22, 166 P.3d 608 ("[J]udge[s] conducting a best interests analysis must weigh evidence forecasting future events in order to predict what course of action will best protect and nurture the child.").

instability, the district court had sufficient reason to forecast disruption and harm to the children upon reentry by Father.

¶34 Second, there is evidence in the record that Father's reintroduction to the children would be disruptive. Mother testified that, sometimes after visits with Father's sister, the children would come back referring to Stepfather by his first name instead of "Dad." And one of the children, D.W.C., would return "agitated" and struggle to follow household rules. This evidence, combined with Father's lengthy absence from the children's lives, provided the court with evidence that Father's reentry, with or without reunification therapy, would be disruptive to the children and their relationship with Stepfather.

¶35 Lastly, Father argues that the district court failed to consider the impact terminating his rights would have on the children's relationship with his sister and stepmother. While it is true that the district court did not mention the children's relationship with Father's family, the record before us does not support the concern that children's relationship with Father's sister or stepmother would change. In fact, Mother's testimony at the termination trial is contrary to such a conclusion. Under no obligation to do so, Mother has continued to allow the children to visit Father's sister and has continued to invite Father's stepmother to the children's events. She also testified that it was important for the children to "know about their biological side" and that she "wanted to keep contact with [Father's] side of the family." Accordingly, with no indication that children's relationship with Father's family would change, the district court did not err by not considering it.

¶36 Having rejected Father's arguments against the district court's termination order, we conclude that the court's termination of Father's parental rights was not against the clear weight of the evidence. We therefore affirm.

## CONCLUSION

¶37 We conclude that the district court applied the correct strictly necessary analysis, and its best interest determination was supported by the evidence. We therefore affirm the termination of Father's parental rights.

———————————

POHLMAN, A.C.J., concurring in part, dissenting in part,
and concurring in judgment

ASSOCIATE CHIEF JUSTICE POHLMAN, concurring in part, dissenting in part, and concurring in judgment:

¶38 I concur in part, dissent in part, and concur in judgment for the same reasons outlined in my separate opinion in *Ross v. Kracht*, 2026 UT 23, _ P.3d _ (Pohlman, A.C.J., concurring in part, dissenting in part, and concurring in judgment). As in *Ross*, I would assume that the strictly necessary requirement applies to Utah Code subsection 81-13-205(5)(e) without deciding the issue, and I would affirm the district court's decision on the basis that its best interest determination was not against the clear weight of the evidence. *See supra* ¶¶ 22–36.

––––––––––––